WAGNER, Appellant, vs. INDUSTRIAL COMMISSION and others, Respondents.*

*September 14—November 7, 1956.*

* Motion for rehearing denied, without costs, on January 7, 1957.

554

For the appellant there was a brief by *Fairchild, Charne & Kops* of Milwaukee, and oral argument by *Irvin B. Charne*.

For the respondent Industrial Commission there was a brief by the *Attorney General* and *Mortimer Levitan,* assistant attorney general, and oral argument by *Mr. Levitan*.

For the respondents Ampco Metal, Inc., and Hardware Mutual Casualty Company there was a brief by *Quarles, Spence & Quarles,* attorneys, and *Norman C. Skogstad* and *Walter P. Rynkiewicz* of counsel, all of Milwaukee, and oral argument by *Mr. Skogstad* and *Mr. Rynkiewicz*.

On the motion for rehearing, briefs were also filed by *Toebaas, Hart, Kraege & Jackman* of Madison, and by *Padway, Goldberg & Previant, Albert J. Goldberg,* and *Hugh Hafer,* all of Milwaukee, as *amici curiae*.

CURRIE, J. The employee Wagner raises the following contentions on this appeal:

(1) That the evidence requires a finding that the temporary partial disability sustained by Wagner during the period from December 10, 1951, through August 15, 1952, was greater than 33⅓ per cent.

(2) That October 2, 1951, should have been determined as the date of injury, rather than April 6, 1951, for all disability occurring subsequent to October 2, 1951.

(3) That the evidence requires a finding that Wagner did sustain permanent disability as a result of his employment by Ampco and that the finding to the contrary is without support in the evidence.

With respect to the first contention raised, Dr. Ruch testified that Wagner's dermatitis was 80 per cent healed as of December 7, 1951, and that the total disability should end December 10, 1951. Wagner was actually engaged in farming during the winter of 1951–1952, milking cows, doing the feeding, and cleaning the barns. He was able to do the spring plowing and the greater share of the field work. Wagner

testified that in April, 1952, the only form of work he did not do was the evening milking which was done by his children, but while they did such milking he was working in the fields. Both Dr. Epstein and Dr. Rowe were of the opinion that Wagner's hands were completely healed by August, 1952.

It is true that there is a complete lack of any testimony fixing Wagner's temporary partial disability from December 10, 1951, to August 15, 1952, at 33⅓ per cent. However, the burden of proof on this issue is upon the employee and not the employer. Wagner failed to establish by credible evidence that his temporary partial disability during the period in question was greater than 33⅓ per cent.

Counsel for Wagner contend that from a wage-loss basis such temporary partial disability was established at more than 33⅓ per cent. The issue of wage loss is treated in that part of this opinion dealing with the problem of permanent disability. Only if it should develop that there is permanent disability in excess of 33⅓ per cent should the commission's finding with respect to the percentage of temporary partial disability be disturbed. Obviously the percentage of temporary partial disability cannot be less than the percentage of permanent disability.

We turn now to Wagner's second contention, that October 2, 1951, should be determined as the date of injury as to all disability occurring subsequent to that date. The 1951 legislature increased the maximum wage rate upon which compensation is to be based by enacting ch. 382, Laws of 1951, effective July 1, 1951, which amended sec. 102.11 (1), Stats. By the commission fixing the date of injury as being April 6, 1951, none of Wagner's compensation for temporary disability was based upon the increased maximum wage rate established by this 1951 amendment.

The material statutes necessary to be considered are sec. 102.01, Stats. 1949,[1] and sec. 102.03, Stats. 1949.[2] While sec. 102.01 (2) provided that in case of occupational disease the date of injury is the last day of work for the last employer whose employment caused disability, such provision applies only when the wage loss occurs after the termination of employment, and, where there is wage loss from the occupational disease before the termination of employment, the date of the commencement of such wage loss establishes the date of injury. *General A. F. & L. Assur. Corp. v. Industrial Comm.* (1936), 221 Wis. 540, 543, 266 N. W. 224, and *Green Bay Drop Forge Co. v. Industrial Comm.* (1953), 265 Wis. 38, 47, 48, 60 N. W. (2d) 409, 61 N. W. (2d) 847. The reason for this, as explained in the opinions in such two cited cases, is because the 1933 amendment to sec. 102.01 (2), which defines date of injury with respect to disabling occupational disease, was intended to render compensable any disability from occupational disease occurring after the employment causing the same had been terminated. Such 1933 amendment was not intended to change the prior rule established by court decision for determination of date of injury with respect to disabling occupational disease where wage loss had actually occurred prior to termination of employment, or in situations where the employment had not ended.

---

[1] Sec. 102.01(2), Stats. 1949, provided in part as follows:
(2) . . . "Time of injury," "occurrence of injury," "date of injury" is the date of the accident which caused the injury or in the case of disease, the last day of work for the last employer whose employment caused disability.

[2] Sec. 102.03, Stats. 1949, provided in part as follows:
(3) In the case of disease intermittent periods of temporary disability shall create separate claims, and permanent partial disability shall create a claim separate from a claim for any subsequent disability which latter disability is the result of an intervening cause.
(4) The right to compensation and the amount thereof shall in all cases be determined in accordance with the provisions of law in effect as of the date of the injury.

Thus in the instant case Wagner had actually sustained a wage loss in April, 1951, before his employment with Ampco finally terminated on October 2, 1951, and the commission properly found April 6, 1951, to have been the date of injury. While sec. 102.03 (3), Stats. 1949, provided that intermittent periods of temporary disability shall create separate claims, it did not provide that each of such intermittent periods shall have its own separate date of injury. We deem that the record in the instant case establishes that Wagner's dermatitis was not completely cured on the three occasions he returned to work at Ampco between April 6 and October 2, 1951. In other words, while there were four intermittent periods of partial disability they were all due to one continuous occupational disease that assumed its disabling character in April, 1951. We, therefore, conclude that there is credible evidence to support the finding of the commission that April 6, 1951, was the date of injury applicable to all periods of temporary partial disability sustained by Wagner.

The last and most serious issue facing us on this appeal is whether the evidence requires a finding that Wagner sustained some percentage of permanent total disability from occupational disease as a result of his employment by Ampco. The medical testimony is undisputed that he can never again safely resume work in a machine shop or other industrial plant because the skin on his fingers and hands has become so sensitized that he would develop dermatitis if he were again to attempt such work. His basic wage rate as of April 6, 1951, as a tool and diemaker in Ampco's machine shop, was $1.89 per hour. This type of employment is hereafter barred to him, leaving him the option of either farming or doing common labor.

Dr. Ruch testified that Wagner's skin had become highly sensitized and that he adhered to his original diagnosis of "occupational contact dermatitis" due to his contacts at Ampco. Dr. Rowe testified that it was the opinion of both

Dr. Epstein and himself that Wagner became sensitized during his employment by Ampco. Dr. Kalb in his testimony did not deny that Wagner's skin had become highly sensitized due to contact with some irritant and his testimony in no way contradicts the opinion of Drs. Ruch, Rowe, and Epstein in that respect.

The point on which Dr. Kalb disagreed with the opinions of these other three physicians was the source of the irritant which caused the dermatitis. For the reason that when Dr. Kalb was consulted by Wagner late in 1950, Wagner in cold weather had been milking cows, scalding milking utensils, and washing cows' udders with "B-K" on his little Hales Corners farm, and also because of other reasons enumerated by the doctor, it was Dr. Kalb's opinion that Wagner's dermatitis was "not essentially industrial in nature." The commission, however, rejected this opinion of Dr. Kalb when it expressly found that Wagner's contact dermatitis was due to his employment by Ampco. Inasmuch as Dr. Kalb expressed no opinion bearing on the issue of permanent disability we do not consider that his testimony has any bearing whatever on that issue.

The reason assigned by the commission in its memorandum opinion for denying permanent disability was "that whatever disability he may have had or may have henceforth will be due to *original sensitivity not increased or such as to render him more susceptible by injury in respondent's* [Ampco's] *employ.*" (Italics supplied.) We have searched the record in vain to find any evidence to support such determination that any further disability of Wagner was due to *original sensitivity not increased by injury in Ampco's employ.* The inference is inescapable that the commission must have based such finding on something in its past experience rather than any evidence in the record. In *Merton Lumber Co. v. Industrial Comm.* (1951), 260 Wis. 109, 118, 50 N. W. (2d) 42. when confronted with a similar situation, this court stated :

"Counsel for the commission suggests that the knowledge and experience of the commission must be given consideration. We gladly concede it and hope to give it in all proper cases. But while such knowledge and experience is of great value in the appraisal of evidence it is by no means a substitute for evidence. The constitutionality of the Workmen's Compensation Act depends upon the right of judicial review to determine whether the findings are supported by evidence. *Borgnis v. Falk Co., supra.* [(1911), 147 Wis. 327, 133 N. W. 209.] There can be no review of material not in the record and the commission's knowledge and experience is not there. To subject the rights of either employee or employer to decisions based upon facts or expert opinions which do not appear of record would be a denial of due process of law. The findings of fact in the present case cannot be sustained on that principle."

The memorandum opinion of the learned trial court devoted but one paragraph to this issue of permanent disability, and we quote the same:

"The first question is: Was there permanent disability? Dr. Ruch is authority for a conclusion that disability ended December 10, 1951 (tr. 22). Dr. Rowe considered that the man's 'condition continued some time into August of 1952' (tr. 79); that his hands were 'normal' at that time (tr. 81). Dr. Epstein thought that the man was 'completely recovered' by August of 1952 (tr. 83, 84). This evidence sustains the commission's finding."

The trial court completely overlooked the testimony that all three of these doctors considered that Wagner's skin had become sensitized due to his employment by Ampco. Dr. Epstein did not testify but Dr. Rowe was permitted to state that Dr. Epstein's opinion was the same as that of Dr. Rowe. Both Drs. Ruch and Rowe testified that Wagner should never again return to his former employment. It is thus obvious that the portions of the testimony of these physicians, quoted by the trial court in its memorandum opinion, referred only to the clearing up of the visible effects of the dermatitis on

Wagner's hands and did not relate to the sensitivity Wagner had developed as a result of his employment by Ampco, which sensitivity would result in further attacks of dermatitis if Wagner should thereafter attempt to work in a machine shop. It is this sensitivity which has resulted in wage loss and partial permanent disability.

The testimony of the doctors cited by the trial court in the above-quoted paragraph of its memorandum decision was not "credible evidence, *which, if unexplained,* would support the finding of the commission" that there was no permanent disability. *St. Mary's Congregation v. Industrial Comm.* (1953), 265 Wis. 525, 531, 62 N. W. (2d) 19; *Fruit Boat Market v. Industrial Comm.* (1953), 264 Wis. 304, 307, 58 N. W. (2d) 689; *Motor Transport Co. v. Public Service Comm.* (1953), 263 Wis. 31, 46, 56 N. W. (2d) 548; and *Hills Dry Goods Co. v. Industrial Comm.* (1935), 217 Wis. 76, 85, 258 N. W. 336. They were merely isolated statements taken out of context which are completely explained by other testimony given by these same physicians. This is not a situation of the same witness having given conflicting testimony because, in such a situation, the commission may base its decision on which of the two conflicting pieces of testimony it chooses to believe, and, on review, a court would have no power to weigh the evidence and disturb such a finding.

Accepting the commission's finding that Wagner's contact dermatitis was due to his employment by Ampco, it is our considered opinion that the record will support no other finding than that Wagner has sustained permanent disability as a result of the skin of his fingers and hands having become sensitized during the course of employment by Ampco as a result of years of contact there with irritants which produced such sensitivity. We further determine that the measure of such disability in terms of percentage is the percentage of wage loss he has sustained as a result of being unable to do

work in a machine shop or industrial plant where he was earning $1.89 per hour. On this latter point we quote 2 Larson, Law of Workmen's Compensation, p. 1, sec. 57.00, as follows:

"Compensable disability is inability, as the result of a work-connected injury, to perform or obtain work suitable to the claimant's qualifications and training. The degree of disability depends on impairment of earning capacity, which in turn is presumptively determined by comparing pre-injury earnings with post-injury earning ability; the presumption may, however, be rebutted by showing that post-injury earnings do not accurately reflect claimant's true earning power."

The attorney general, in behalf of the commission, maintains that if there is permanent disability it is only to the hands and not the entire body, and, therefore, must be measured by the schedule set forth in sec. 102.52, Stats. 1949. We cannot agree. Wagner could have lost a finger or a hand and still be able to again work in a machine shop or industrial plant, although probably at a reduced wage rate from that earned prior to the injury resulting in the amputation. However, in the present permanently sensitized condition of his hands he is rendered unemployable in a machine shop or industrial plant. His disability is greater than that limited to his hands only and actually is one of the same category as extending to the whole body. We deem the following principle enunciated in 2 Larson, Law of Workmen's Compensation, p. 44, sec. 58.20, is applicable by analogy to the case at bar:

"The great majority of modern decisions agree that, if the effects of the loss of the member extend to other parts of the body and interfere with their efficiency, the schedule allowance for the lost member is not exclusive. A common example of this kind of decision is that in which an amputation of a leg causes pain shooting into the rest of the body, general debility, stiffening of the hip socket, or other extended effects resulting in greater interference with ability to work than would be expected from a simple and uncomplicated loss of the leg."

From the record before us we are unable to determine the percentage of permanent disability. Neither do we believe that such record is sufficient for the commission to do so without the taking of further testimony. One reason for such conclusion is that there is no evidence in the record as to the hourly rate of pay in Milwaukee county, where Wagner resided at time of injury, for common outdoor labor other than farm labor. A second reason is that, although evidence was adduced as to the rate of pay for farm labor, this covered laborers who work for farmers, with the latter necessarily directing the work to be done. Wagner has demonstrated that he has the know-how and ability to successfully operate a farm himself, and, therefore, should command a higher wage rate than a common farm laborer.

In an attempt to disprove that Wagner had sustained any wage loss, counsel for the insurance carrier rely upon testimony as to the amount of Wagner's gross income from farming operations in 1951 and 1952. However, it is *net income,* including the value of the farm products consumed by the Wagner family, which is material on the issue of wage loss. From such figure a deduction should properly be made for a reasonable return on the amount invested by Wagner in his land, farm buildings, exclusive of residence, and income-producing farm personal property, in order to arrive at net income due solely to labor.

Pursuant to the power vested in this court by secs. 251.09 and 102.24 (1), Stats., we conclude that the cause should be remanded to the commission for the purpose of taking such further testimony on the issue of the wage loss sustained, or sustainable, by Wagner as may be necessary to enable the commission to compute the percentage of permanent disability in accordance with this opinion.

*By the Court.*—The judgment is affirmed in so far as applicable to the commission's fixing of April 6, 1951, as the date of injury, and the remainder of the judgment is reversed,

and cause remanded to the circuit court with directions to in turn remand to the commission for the taking of further testimony and making an award of permanent partial disability in accordance with this opinion. In such remand to the commission the award of temporary partial disability based upon a percentage of 33⅓ per cent is to stand unless the commission determines the permanent partial disability at a greater percentage than 33⅓ per cent, in which latter case the percentage of temporary partial disability is to be increased to that of the permanent partial disability.

FAIRCHILD, C. J., took no part.

The following opinion was filed January 7, 1957:

CURRIE, J. (*on motions for rehearing*). The briefs filed in support of respondents' motions for rehearing contend that permanent partial disability must be determined on the basis of body loss, not wage loss. The governing statute is sec. 102.44 (3), Stats., which reads as follows:

"For permanent partial disability not covered by the provisions of sections 102.52 to 102.56 the aggregate number of weeks of indemnity shall bear such relation to the number of weeks set out in paragraphs (a) and (b) as the nature of the injury bears to one causing permanent total disability and shall be payable at the rate of 70 per cent of the average weekly earnings of the employee to be computed as provided in section 102.11. Such weekly indemnity shall be in addition to compensation for healing period and shall be for the period that he may live, not to exceed, however, these named limitations, to wit:

"(a) One thousand weeks for all persons fifty years of age or less.

"(b) For each successive yearly age group, beginning with fifty-one years, the maximum limitation shall be reduced by 2½ per cent per year, with no reduction in excess of 50 per cent."

The case of *Northern States Power Co. v. Industrial Comm.* (1947), 252 Wis. 70, 30 N. W. (2d) 217, is cited in support of such contention. That case involved an injury sustained as a result of accident, and not, as in the instant case, disability caused by occupational disease. This distinction would be immaterial if we were dealing with a scheduled or relative disability covered by secs. 102.52 and 102.55, Stats. *Green Bay Drop Forge Co. v. Industrial Comm.* (1953), 265 Wis. 38, 60 N. W. (2d) 409, 61 N. W. (2d) 847. Whether such distinction is material as to a case of permanent partial disability due to occupational disease bearing no relation to the schedules of sec. 102.52 is an issue which confronts us here.

In the *Northern States Power Co. Case* the employee sustained an injury in the nature of a protruded intervertebral disc while lifting a refrigerator during a demonstration to a customer, for which he was operated upon. Based upon medical testimony that he had sustained a 10 to 15 per cent permanent disability due to loss of motion in the spine, the commission determined his permanent partial disability at 12½ per cent and its award of compensation was affirmed on review by the circuit court. On appeal, the employer and his insurance carrier contended that, because the employee's earnings were as high, or higher, after the ending of the healing period, as they were at the time of the accident, he had sustained no permanent partial disability within the meaning of sec. 102.44 (3), Stats. This court, in an opinion written by Mr. Justice WICKHEM, held that prior to the 1923 amendments to the Workmen's Compensation Act, establishing schedule and relative disabilities, permanent partial disability was measured by wage loss, but that, by reason of such amendments, permanent partial disability is now measured by body impairment and not wage loss. We quote from the opinion as follows (252 Wis. p. 76):

"During the healing period it is possible to establish a wage loss because that is a past event. But since an award for permanent disability is to be made for all time at the end of this period it must be based upon some sort of prediction as to impairment of earning capacity. It appears to us that the legislature has specifically chosen in the case of nonschedule permanent partial disabilities the method of comparing the severity of the injuries causing such a disability with those causing permanent total disability. We see no other construction that will give meaning to sec. 102.44 (3)."

In the case of a nonschedule or relative injury due to industrial accident, such as was involved in the *Northern States Power Co. Case,* it is possible for a physician to examine the injured employee, after the healing period has been completed, to determine whether there has been any impairment of body functions. If such impairment is found, it is further possible for the physician to determine the ratio which such impairment bears to total disability and place a percentage on such permanent partial disability. In case of some partially disabling occupational disease it may be also possible for a physician by physical examination to determine the percentage of permanent partial disability then existing. However, in the instant case, it is utterly impossible to make a physical examination of Wagner and determine the percentage of permanent partial disability. This is because the sensitivity produced by the dermatitis cannot be measured objectively.

There is no question but what Wagner has sustained a permanent partial disability as pointed out in the original opinion. It is our conclusion that in situations like this, where the permanent partial disability cannot be determined by objective examination, it must be determined on the basis of wage impairment. Any other result would leave Wagner remediless. The wording of sec. 102.44 (3), Stats., does not preclude such an interpretation, and we deem the same to be consistent with the objectives of the Workmen's Compensation Act.

The brief of the attorney general questions this statement in our original opinion (ante, p. 560) : "Obviously the percentage of temporary partial disability cannot be less than the percentage of permanent disability."

Temporary partial disability is, under the provisions of sec. 102.43 (2), Stats., measured in terms of wage loss, while permanent partial disability, under the provisions of sec. 102.44 (3), Stats., is measured on the basis of body impairment. To establish the amount of such body impairment, in the highly unusual type of occupational-disease situation present here, wage impairment may be the only measuring stick. However, temporary partial disability under the provisions of sec. 102.43 (2) is measured in terms of actual wage loss. Other factors than actual wage loss may be considered in determining the permanent partial disability, as pointed out in the original opinion. Therefore, the above-quoted sentence in the original opinion is erroneous and is withdrawn. This same error carried over into the mandate, which requires that the same be modified.

In the concluding paragraph of our original opinion we stated that the cause was being remanded to the commission under the powers vested in this court under secs. 251.09 and 102.24 (1), Stats. Upon further consideration, we now deem it was error to base such remand on any powers of this court under sec. 251.09, as this section has no application to court review of Industrial Commission orders under the Workmen's Compensation Act. If the commission makes a finding of fact not supported by the evidence, and the commission's order, or any part thereof, rests on such finding, the setting aside of the order on court review authorizes a remand for further proceedings under the provisions of sec. 102.24 (1), Stats. *M. & M. Realty Co. v. Industrial Comm.* (1954), 267 Wis. 52, 64 N. W. (2d) 413. In the instant case the erroneous finding of fact was that which determined that there was no permanent partial disability.

*By the Court.*—The original mandate is amended to read as follows: "Judgment is affirmed in so far as applicable to the commission's fixing of April 6, 1951, as the date of injury and the determination of the temporary partial disability. The remainder of the judgment is reversed, and cause remanded to the circuit court with directions to set aside that part of the order which found no permanent disability, and to remand to the commission for the taking of further testimony and the making of an award of permanent partial disability in accordance with this opinion." Motions for rehearing are denied without costs.